UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF EXTRADITION OF RAPHAEL JOSEPH | Civil No.  06mg2273 (POR)<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

This matter having come before this Court pursuant to Title 18 United States Code, Section 3181, et. seq., for a hearing at the request of Australia for the extradition of Raphael Joseph, and this Court having held an extradition hearing on April 10 and May 18, 2007, and having considered the evidence received at the hearing along with the arguments of counsel and the papers submitted, this Court hereby affirms its oral ruling of May 18, 2007, that Raphael Joseph a.k.a. Rafi Yousif Tooma a.k.a. Tony Toma a.k.a. Hussony ("Joseph") is extraditable under the extradition treaty between the United States of America and Australia.  Treaty on Extradition Between the United States and Australia, May 14, 1974, 27 U.S.T. 957, TIAS 8234 (the "Treaty") (amended by Protocol dated September 4, 1990 (the "1990 Protocol")).  This Court also makes the following findings of fact and conclusions of law.

## I.

## **BACKGROUND OF THE CASE**

On December 12, 2006, the United States Attorney's Office for the Southern District of

1  California, acting on behalf of Australia, presented a complaint for provisional arrest to the
2  Honorable Leo S. Papas.  The complaint requested that Magistrate Judge Papas issue a warrant for
3  the arrest of Joseph with a view toward extradition.  The United States Attorney's Office presented
4  the complaint against Joseph pursuant to the extradition treaty between Australia and the United
5  States.

6  The complaint charged Joseph with Murder in violation of the New South Wales Crimes Act
7  1900, Section 18(1)(a).  According to the complaint, Joseph and co-offender Raymon Youmaran
8  shot and killed Dimitri De-Baz on December 13, 2002.  Joseph was arrested pursuant to the
9  provisional arrest warrant and was ordered detained following a hearing before this Court on
10 December 18, 2006.

11 On February 20, 2007, the United States Attorney's Office filed an official extradition
12 request, along with certified documents in support of the extradition request.  The certified
13 documents include Diplomatic Note No. 38/2007 from the Embassy of Australia, formally
14 requesting the extradition of Joseph, as well as a Request for the Extradition to Australia from the
15 United States of America of Raphael Joseph, by Christopher Martin Ellison, Australian Minister for
16 Justice and Customs, dated January 31, 2007.  The filing of certified documents permitted Australia
17 to go forward with extradition proceedings under the Treaty.  This Court held an extradition hearing
18 on April 10 and May 18, 2007.

**II.**

**GENERAL PRINCIPLES REGARDING EXTRADITION HEARINGS**

21 The sole purpose of an extradition hearing, held pursuant to 18 U.S.C. § 3184 (and the
22 applicable Extradition Treaty), is to determine whether or not the individual who has been arrested
23 in the United States pursuant to a complaint filed on behalf of a foreign government is subject to
24 surrender to the requesting country.  The substantive right of a foreign country to request the return
25 of a fugitive, and the duty of the United States to deliver the fugitive, depends entirely on the
26 existence of a treaty between the requesting nation and the United States.  18 U.S.C. § 3181, Factor
27 v. Laubenheimer, 290 U.S. 276 (1933).  To invoke its right to extradite a fugitive, the requesting
28 nation must submit its request to a state or federal court.  18 U.S.C. § 3184.  The court determines

whether the fugitive is subject to extradition, and, if so, must order the fugitive's commitment and certify the supporting record to the Secretary of State. Id. The Secretary of State bears the responsibility for deciding whether surrender will ultimately occur. 18 U.S.C. § 3186; Barapind v. Reno, 225 F.3d 1100, 1105-6 (9th Cir. 2000) ("[o]nce the magistrate [judge] has certified to the Secretary of State that the individual is extraditable and any habeas review has concluded, the Secretary in her discretion may determine whether the alien should be surrendered to the custody of the requesting state based on humanitarian or other concerns"). The fugitive cannot obtain direct appellate review of either the extraditing court's decision, In re Metzger, 46 U.S. 176, 191-92 (1847); Collins v. Miller, 252 U.S. 364, 369 (1920) ("the proceeding before a committing magistrate in international extradition is not subject to correction by appeal"); or the Secretary of State's exercise of discretion. Escobedo v. United States, 623 F.2d 1098, 1105 (5th Cir. 1980) ("the Executive's discretionary determination to extradite the fugitive. . . is not generally subject to judicial review"). The fugitive may obtain habeas corpus relief on the grounds of lack of probable cause, failure to prove identity, or failure to charge an offense within the meaning of the treaty. Corenjo-Barreto v. Seifert, 218 F.3d 1004, 1009-10 (9th Cir. 2000).

  The Government must prove several elements before Joseph may be found extraditable by this Court. These elements roughly fall into six categories: (1) that the Court has jurisdiction to decide the question of extradition; (2) that a treaty of extradition exists between the United States and Australia and that the crimes with which Joseph has been charged are covered by that treaty; (3) that Joseph has been charged with such offenses in the requesting country; (4) that the offenses with which Joseph is charged in Australia are also offenses in the United States (dual criminality); (5) that Joseph is the same individual charged with the offenses by the requesting party (identity); and (6) that there is some evidence warranting the finding that there is reasonable ground to believe Joseph is guilty (probable cause). Fernandez v. Phillips, 268 U.S. 311 (1925); Cf. In re Extradition of Platko, 213 F. Supp. 2d 1229, 1235 (S.D.Cal. 2002); Cf. In re Extradition of Valdez-Mainero, 3 F. Supp. 2d 1112, 1114-15 (S.D.Cal. 1998).

  In short, the paramount principle of every extradition proceeding is to determine whether probable cause exists to believe the person whose surrender is sought has committed the crime for

1  which his extradition is requested. <u>Glucksman v. Henkel</u>, 221 U.S. 508, 512 (1911) ("if there is
2  presented, even in somewhat untechnical form according to our ideas, such reasonable ground to
3  suppose him guilty as to make it proper that he should be tried, good faith to the demanding
4  government requires his surrender"); <u>Blaxland v. Commonwealth Dir. of Pub. Prosecutions</u>, 323
5  F.3d 1198, 1208 (9th Cir. 2003) ("if the evidence is sufficient to sustain the charge, the inquiring
6  magistrate judge is required to certify the individual as extraditable").

## III.
## SUMMARY OF FACTS UNDERLYING ALLEGED OFFENSE

9       Australia seeks to extradite Joseph on the charges of murder and grievous bodily harm. It is
10 alleged that Joseph committed murder in Sydney, New South Wales on December 13, 2002, and that
11 he committed Grievous Bodily Harm in Surfers Paradise, Queensland on October 26, 2002.

12      The New South Wales offense was allegedly committed by Joseph when Demitri De-Baz
13 was murdered in the parking lot of the Sefton Playhouse Hotel in Sydney. The police report
14 describing De-Baz's murder states that Joseph and four friends arrived at the hotel and immediately
15 engaged in a fight with another group of men. Joseph and co-offender Raymon Youmaran allegedly
16 retreated to the parking lot, retrieved guns from the car in which they arrived and both shot and
17 killed De-Baz after he emerged from the hotel and threw a bottle in their direction.

18      The Queensland offense was allegedly committed by Joseph when he punched Sofia Tahiraj,
19 causing a compound fracture of her jaw and other injuries.

## IV.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

22      After consideration of the documentary evidence and oral argument, this Court finds that the
23 government of Australia, as represented by the United States Department of Justice, has established
24 that:

25      1.    The documents submitted in support of Australia's extradition request are in proper
26 form and are properly authenticated. Article 7 of the 1990 Protocol, which replaced Article XI of
27 the Extradition Treaty, and 18 U.S.C. § 3190 require that the documents submitted by Australia be
28 received into evidence if the principal consular officer of the United States has certified the

1  authentication of the documents.  The documents submitted in support of Australia's extradition
2  request were certified on February 2, 2007, by Michael P. Owens, Chargé d'Affaires of the United
3  States Embassy in Canberra.  A declaration signed by David O. Buchholz, Attorney Advisor in the
4  Office of Legal Advisor for the United States Department of State states that Owens was the
5  principal consular officer of the United States in Australia at the time the documents were certified.
6  A declaration signed by Secretary of State Condoleezza Rice confirms Buchholz's position and
7  validates his declaration.  Thus, the authenticated documents certified on February 2, 2007 were
8  properly received into evidence.

9  Additional documents were submitted in support of the extradition request on March 19,
10 2007.  The documents were certified by Robert D. McCallum, Jr., Ambassador to Australia of the
11 United States of America.  On March 18, 2007, McCallum was the principal consular officer of the
12 United States in Australia.  These additional documents were properly received into evidence.

13 Additional documents were also submitted in support of the extradition request on May 10,
14 2007.  Those documents too were certified by Robert D. McCallum, Jr., Ambassador to Australia of
15 the United States of America, who was on that date the principal consular officer of the United
16 States in Australia.  Thus, these additional documents were also properly received into evidence.

17 2. This Court has jurisdiction to determine the question of extradition.  18 U.S.C. §
18 3184.  This Court also has jurisdiction over Joseph, who is in custody before this Court, and was
19 found in the Southern District of California.  Joseph does not challenge the authority of this Court to
20 conduct his extradition hearing.

21 3. There is a valid extradition treaty in force and effect between the United States and
22 Australia.  The Treaty was signed on May 14, 1974, and went into effect on May 8, 1976.  27 U.S.T.
23 957.  The Treaty was amended by Protocol on September 4, 1990 and the Protocol entered into force
24 on December 21, 1992.  David Buchholz, Attorney Adviser, Office of the Legal Adviser,
25 Department of State, United States of America, provided a declaration attesting that the Extradition
26 Treaty is in full force and effect between the United States and Australia.  That declaration was
27 properly sealed by the Secretary of State, Condoleezza Rice.  Additionally, Joseph does not dispute
28 the fact that there is a valid treaty in force and effect between the United States and Australia.

1    4.    The crimes charged against Joseph are covered by the Treaty because they are
2 crimes punshishable in both Australia and the United States by imprisonment of one year or more.
3 Although not specifically enumerated in the Treaty, the crimes charged are covered by Article 2 of
4 the Treaty, as replaced by Article 1 of the 1990 Protocol section 1, which provides: "An offence
5 shall be an extraditable offence if it is punishable under the laws in both Contracting Parties by
6 deprivation of liberty of more than one year, or by a more severe penalty."
7    Australia provides an Affidavit of Catherine Dodds of the Office of the Director of Public
8 Prosecutions, New South Wales.  Dodds swears, and an annexure to her affidavit confirms, that in
9 New South Wales, under the Crimes Act 1900, Section 19A(1): "a person who commits murder is
10 liable to imprisonment for life."  In the United States, under federal law, first degree murder is
11 punishable by death or life imprisonment and second degree murder is punishable for any term of
12 years or for life. 18 U.S.C. § 1111(b) (2007).
13   Australia also provides an Affidavit of Peta Raykene Eyschen of the Queensland Police
14 Department.  Eyschen swears, and an annexure to his affidavit confirms, that in Queensland, under
15 Section 320 of the Criminal Code Act 1899, "a person who unlawfully does grievous bodily harm to
16 another is guilty of a crime, and is liable to imprisonment for 14 years."  In the United States, under
17 federal law, assault and battery causing substantial bodily injury is punishable by imprisonment of
18 not more than ten years.  18 U.S.C. § 113 (2007).  In California, battery causing serious bodily
19 injury is punishable by up to four years of imprisonment. Cal. Penal Code 243(d).
20   5.    Joseph does not dispute that there are charges pending against him in Australia for
21 the offenses for which extradition is sought.  An arrest warrant issued in New South Wales by M.
22 Randall, Justice of the Peace on April 16, 2003, charges that Joseph "did feloniously and
23 maliciously murder Dmitri Debaz."  It is represented by Australia that this is the only charging
24 document that will issue for the charge of murder in New South Wales.
25   Joseph was charged in Queensland with the offense of grievous bodily harm and was
26 released on bail pending trial.  Joseph failed to appear and a warrant was issued for his arrest on
27 June 4, 2003 by T.N. Arnold, Magistrate of the state of Queensland.
28   There are criminal charges pending against Joseph in Australia for both crimes for which

1   extradition is sought.

2       6.    Though a finding of dual criminality is not required by the Treaty, as amended by Article 1 of the 1990 Protocol, the Court finds that the offenses with which Joseph is charged in Australia are also offenses in the United States.  Murder is a crime in both countries.  Although the offenses of grievous bodily harm and battery causing serious bodily injury are not identically phrased in the United States and Australia, the crimes are substantially analogous.

    7.    The Court finds that the Raphael Joseph named in the request for extradition as "Raphael Joseph a.k.a. Rafi Yousif Tooma a.k.a. Tony Toma a.k.a. Hussony", and the person brought before this Court on the complaint for extradition, are one and the same person.  Joseph does not dispute that he is the person charged with the offenses in Australia.

The extradition request described the person sought in New South Wales as a naturalized Australian citizen, born in Iraq on either September 8, 1976 or October 10, 1976.  He is described as being of medium build, between 175 and 178 centimeters tall, 78 kilograms (approximately 171 pounds), with short dark-brown wavy hair, brown eyes and an olive Middle-Eastern complexion.  The extradition request contains photographs from an Australian passport application.  The Court compared the description and the photographs provided in the request to the person presented before the Court, and found the person before the Court to be the same person for whom Australia seeks extradition.

The Court also reviewed the Declaration of Detective Senior Constable W.J. English, a certified fingerprint expert at Fingerprint Operations, Forensic Services Group, Parramatta, New South Wales.  Detective English compared the fingerprints of the person sought for arrest in New South Wales with those of the person detained by agents of the U.S. Department of Homeland Security and brought before this court.  Detective English concluded that the same person made the two sets of fingerprints.

## V.

## PROBABLE CAUSE

Finally, this Court must determine whether there is some evidence warranting a finding that there are reasonable grounds to believe that Joseph is guilty of committing the crimes with which he

1 is charged.

2     The issue of probable cause in extradition hearings is defined in accordance with the federal law and has been described as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Coleman v. Burnett, 477 F.2d 1187 (D.C. 1973); see Sidona v. Grant, 619 F.2d 167 (2nd Cir. 1980); Greci v. Birknes, 527 F.2d 956, 959 (1st Cir. 1976).

    Applying this standard to the evidence presented by Australia, a showing of probable cause has been made with respect to the criminal charges for which extradition is sought.

    1.    The crime of Murder charged in New South Wales, under the Crimes Act 1900, Section 18(1)(a) involves an act or omission by the accused done or omitted with reckless indifference to human life, or with intent to kill or inflict grievous bodily harm, or done during the accused's commission of a crime punishable by more than 25 years, which causes a death. (Affidavit of Catherine Dodds.) There is sufficient evidence before this Court to entertain a reasonable belief that Joseph committed the charged offense. The following evidence presented to this Court supports this finding:

    a)    Closed-circuit television footage, as well as statements to the police by Raymon Youmaran and Samir Tiyadoors, place Joseph in the parking lot of the Sefton Playhouse Hotel in Sydney, New South Wales on December 13, 2002, the night of Dimitri De-Baz's murder.

    b)    Closed-circuit television footage captured Joseph, Youmaran, Sandro Mirad and Sahir Marcus walking into, and then running out of, the front door of the hotel. The closed-circuit television footage shows Joseph, Youmaran, Mirad and Marcus running towards an Audi motor vehicle. Youmaran has described that a fight broke out inside the hotel and that he and the others went back to the car to get his Glock handgun. Youmaran has stated that he and Joseph then walked back toward the front door of the hotel.

    c)    Dimitri De-Baz, the deceased, is shown on the closed circuit television

footage walking from the front door of the hotel into the parking lot. Youmaran has told police that De-Baz threw a bottle in the direction of him and Joseph.

    d) Youmaran has stated that after the bottle was thrown by the deceased he heard gunshots and also himself fired gunshots in the direction of De-Baz. Unidentified witnesses have described to the police that Joseph fired shots toward the front door of the hotel. A subsequent ballistics examination confirmed that two nine-millimeter semi-automatic handguns were used during the shooting and that both were Glock handguns. The examination showed that a total of fifteen shots were fired, and that six shots hit the deceased. Youmaran has admitted to the police that he shot the deceased three times while the deceased lay on the ground. It is undisputed that the deceased had no gun.

    e) Youmaran has described to police that he ran back to the car and that Joseph arrived at the car shortly afterwards. Unidentified witnesses described to the police that they saw both Joseph and Youmaran enter an awaiting Audi through already-opened side doors. Youmaran further described that he, Joseph, Mirad and Marcus drove away together, and that Mirad and Marcus were later instructed to exit the vehicle. Youmaran told police that he and Joseph then drove to the home of a friend and turned the two Glock handguns over to that friend for destruction.

    f) Samir Tiyadoors, who was at the Sefton Hotel on December 13, 2002 and arrived there with Joseph and Youmaran, has also made statements to the police about the events that night. In these statements, Tiyadoors has identified Joseph as organizing and being present at meetings held after the murder, at which details of the murder were discussed. Tiyadoors has stated that Joseph made admissions to the murder during these meetings.

2. The crime of Grievous Bodily Harm charged in Queensland, under the Criminal Code

Act 1899, Section 320, involves "the loss of a distinct part or an organ of the body or serious disfigurement or any bodily injury of such a nature that, if left untreated, would endanger or be likely to endanger life, or cause or be likely to cause permanent injury to health; whether or not treatment is or could have been available." (Affidavit of Peta Raykene Eyschen.) There is sufficient evidence before this Court to entertain a reasonable belief that Joseph committed the charged offense. The following evidence presented to this Court supports this finding:

a) The complainant, Sofia Tahiraj, has made a statement to Queensland police describing that she had a verbal and physical confrontation with Joseph on October 26, 2002 on Orchid Avenue in Surfers Paradise, Queensland. The complainant has described that she argued with Joseph and a group of his friends, that a beverage was poured on her and that she was hit on the side of her head. The complainant stated that she used a small blade attached to her key-ring to slash at Joseph's neck when he continued to approach her. She has described that she then ran away from Joseph, but that he chased her and punched her in the face. The complainant stated that she was treated at the hospital for a fractured nose, cheekbone and jaw.

b) A friend of the complainant, Joanne Pearce, was a witness to the events of October 26, 2002 and also made a statement to Queensland police. The witness described seeing the verbal altercation between Tahiraj and Joseph and other men. She states that Joseph was being restrained by the other men when he picked up a plastic chair and threw it at Tahiraj, hitting her in the head. The witness saw Tahiraj retreat and saw Joseph chase after Tahiraj and punch her with his right fist, causing Tahiraj to fall to the floor.

c) Detective Senior Constable Stephen Thomas Tiernan was present on Orchid Avenue in Surfers Paradise, Queensland on October 26, 2002. He witnessed yelling between Joseph and Tahiraj, heard Tahiraj threaten to "cut" Joseph, and then saw Tahiraj swipe at Joseph and walk away. Tiernan has reported

|   |   |   |
|---|---|---|
| 1 |   | that he was approaching the group when Joseph chased after Tahiraj.  Tiernan |
| 2 |   | next saw Tahiraj lying unconscious on the ground with Joseph standing over |
| 3 |   | her.  Joseph ran away, but Tiernan communicated a description of Joseph to |
| 4 |   | other police and Joseph was detained a short distance away by Detective |
| 5 |   | Senior Constable Georgia McGill. |
| 6 | d) | Doctor Saima Amer has written a letter of referral following the examination |
| 7 |   | that Tahiraj received in the Emergency Department of Gold Coast Hospital in |
| 8 |   | Southport, Queensland on October 26, 2002.  According to the letter, Tahiraj |
| 9 |   | came to the hospital with "a swollen nose, clinically fractured nasal bone, |
| 10 |   | swelling over forehead, loose upper and lower incisors, swelling left cheek, |
| 11 |   | jaw movements were painful, could not open her mouth fully."  Doctor Amer |
| 12 |   | reported that an x-ray of Tahiraj's jaw "revealed a compound fracture of the |
| 13 |   | iferior [sic] rama of mandible. This would require some maxilofacial |
| 14 |   | surgery." |
| 15 | e) | The Court takes judicial notice of the definition of a compound fracture.  As |
| 16 |   | provided by the Attorney's Medical Deskbook, a "compound fracture" is |
| 17 |   | described as the condition whereby "[a] bone fragment penetrates the skin |
| 18 |   | surface overlying the bone." Dan Tennenhouse, ATTORNEY'S MEDICAL |
| 19 |   | DESKBOOK 3d edition 16-52 (Clark Boardman Callaghan 1993).  Merriam- |
| 20 |   | Webster Dictionary defines "compound fracture" as "a bone fracture resulting |
| 21 |   | in an open wound through which bone fragments usually protrude." |
| 22 |   | MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 10th edition 236 (Merriam- |
| 23 |   | Webster Inc. 2001). |

## VI.

## **CONCLUSION**

This Court has jurisdiction to hear this extradition matter and has jurisdiction over Joseph. Joseph is the person sought by Australia in this extradition proceeding.  Probable cause exists to believe that Joseph committed the crime of Murder, a violation of the New South Wales Crimes Act

1 | 1900, Section 18(1)(a) . Probable cause also exists to believe that Joseph committed the crime of
2 | Grievous Bodily Harm, a violation of the Queensland Criminal Code Act 1899, Section 320. The
3 | offenses charged are extraditable offenses under the valid extradition treaty between Australia and
4 | the United States.  The offense is punishable under the laws of both the United States and Australia.
5 | Therefore, the Court GRANTS the request for extradition with respect to the charged offenses.

6 | The extradition request and the supporting documents admitted into evidence during the
7 | hearing are properly certified and authenticated or otherwise admissible within the discretion of the
8 | Court.

9 | Accordingly, the Court will certify the above findings, and all documents admitted into
10 | evidence, to the Secretary of State, pursuant to 18 U.S.C. § 3184.  The Department of Justice shall
11 | prepare a certification and order of commitment consistent with this memorandum as required by 18
12 | U.S.C. § 3184.

13 | **IT IS SO ORDERED**.

14 | DATED:  June 6, 2007

_____
LOUISA S PORTER
United States Magistrate Judge